## UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| ADVANCED CONCRETE TOOLS, INC., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 3:10-cv-1139** |
| v. | ) | **Judge Aleta A. Trauger** |
| | ) | |
| HERMAN BEACH, | ) | |
| | ) | |
| **Defendant.** | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The plaintiff, Advanced Concrete Tools, Inc. ("ACT"), and the defendant, Herman Beach,

entered into an Asset Purchase Agreement related to the sale of ACT's assets to Beach. ACT

contends that Beach breached the agreement and therefore owes money to it, whereas Beach

believes that ACT breached the agreement first and, therefore, owes money to him. On March 5-

6, 2014, the court conducted a bench trial concerning these competing theories of liability. Under

Fed R. Civ. P. 52(a)(1), the court sets forth its findings of fact and conclusions of law herein,

concluding that Beach is liable to ACT for $347,506.96 plus pre-judgment interest.

## PROCEDURAL BACKGROUND

On October 25, 2010, ACT filed the instant lawsuit against Beach and Manown

Engineering Co., Inc. ("Manown") in Tennessee state court. (Docket No. 1, Ex. 1.) On

December 2, 2010, the defendants removed the case to this court. (Docket No. 1.)[1] On

December 19, 2010, the defendants filed an Answer and Counterclaims (Docket No. 10),

including four counterclaims: (1) fraud and deceit (Count I); (2) breach of the duty of care (Count

---

[1]This case was originally assigned to Judge William J. Haynes, Jr.

1

II); (3) fraud in the inducement (Count III); and (4) breach of contract (Count IV). On September 9, 2011, the court granted partial summary judgment to ACT with respect to Counterclaims I-III only. (Docket No. 38.)

On May 2, 2012, the court granted summary judgment to ACT on its breach of contract claim, awarding it $500,000. (Docket No. 65.) On May 8, 2012, the defendants filed a Notice of Appeal to the Sixth Circuit. (Docket No. 66.) While the appeal was pending, the parties stipulated to the dismissal of Manown from the appeal. (Docket No. 68.)[2] On May 1, 2013, the Sixth Circuit reversed the court's judgment and remanded the case, finding that it was reversible error for the court to have granted summary judgment to a non-moving party (ACT) without notice to Beach. (Docket No. 77.) Because the Sixth Circuit remanded the case on procedural grounds, the Sixth Circuit vacated the court's damages analysis and expressed no opinion concerning its merits. On June 14, 2013, Judge Haynes recused himself and the case was reassigned to this judge. (Docket No. 91.)

In the Amended Pretrial Order, ACT claimed that Beach owes ACT the balance of the purchase price allegedly due under the parties' June 5, 2007 Asset Purchase Agreement ("APA) (DX-1), while Beach argued (1) he is not liable to ACT because ACT breached the contract first,

---

[2]At the bench trial, the parties furnished a copy of a "Forbearance Agreement" between ACT on the one hand and Manown and Darwin Gilmore (Manown's owner) on the other. (*See* Docket No. 131, Ex. 1; *see also* Docket No. 129.) Under its terms, Manown agreed to pay $150,000 to ACT, including a $30,000 up-front payment and payments of the remaining $120,000 in monthly installments of at least $1,600. Gilmore also personally guaranteed the full $150,000 payment to ACT. Manown and Gilmore also agreed that, if they defaulted on their obligations, they would "remain liable for the whole judgment." (*Id.* ¶ 1(h).) According to trial testimony and a chart submitted into evidence by ACT, Manown had paid $66,093.04 as of March 3, 2014, leaving a balance of $83,906.96 under the Forbearance Agreement. (PX-11.) Manown has regularly made the required payments from July 2012 forward.

(2) even if he is liable to ACT, the liability should be limited to 2% of the gross sales of certain

screeds as set forth in the APA; and (3) he is otherwise entitled to damages for ACT's alleged

breach.  (Docket No. 128.)  Each party filed Proposed Findings of Fact and Conclusions of Law

(Docket Nos. 109 (ACT) and 112 (Beach).)  The parties also filed a set of Stipulations.  (Docket

No. 113.)

On March 5 and 6, 2014, the court held a bench trial.  The parties admitted into evidence

Plaintiffs' Exhibits 1-22 and defendants' exhibits 1-33, 39, 43, 46, and 47.  The following

witnesses testified at the trial: (1) Kim Frazier, the President of ACT; (2) Harvey Gardner, a

former ACT employee and consultant; (3) Carl Ellis, the former Sales Manager for ACT; (4)

Sherie Ellis, the former Marketing Manager for ACT; (5) Stephen Brown, the former Production

and Quality Control Manager for ACT; (6) Henry Procopio, an Application Engineer for MTA

Distributors (a distributor of Honda-branded engines); (7) Kelvin Scott, a Machinist for

defendant Manown Engineering; and (8) defendant Herman Beach.  The court also admitted into

evidence certain excerpts from the deposition of Darwin Gilmore.[3]

At the conclusion of the bench trial, the court advised the parties that, although they had

extensively briefed and argued certain pertinent legal issues, neither party had sufficiently

addressed the doctrine of waiver, which was integral to the dispute based on the facts adduced

during trial.  The parties accordingly filed Supplemental Briefs on March 19, 2014 specific to the

issue of waiver.  (Docket Nos. 132 (ACT) and 133 (Beach).)

---

[3]For reasons explained on the record and in a subsequent Order (Docket No. 129), the
court determined that deposition testimony from Gilmore was admissible into evidence under
Fed. R. Civ. P. 32(a)(4).  (*See* Docket Nos. 126-127.)

# FINDINGS OF FACT[4]

## I.      Background Concerning ACT

Prior to June 2007, ACT was in the business of selling certain construction-related products, including concrete screeds designed to assist contractors in leveling poured concrete.[5] Until 2002, Roy Frazier presided over ACT's operations.[6]  At some point before 1998, Mr. Frazier and two other individuals acquired screed-related patents, which ACT utilized to create to two types of screeds that it marketed as the "Black Beauty" and the "Silver Beauty," respectively. In 2002, Roy Frazier died.  Mrs. Kim Frazier, Roy Frazier's widow, says that she did not and does not "know a screw from a nail." Nevertheless, in the interest of continuing to secure income for herself and her family, she took over ACT following Roy's death.

To manufacture screeds for sale, ACT purchased parts and materials from third parties, which it assembled at an ACT assembling facility in Tennessee.  At some point before 2002, Mr. Frazier and Terry Barbrey at Perfection Molders ("Perfection") entered into an agreement, whereby Perfection agreed to fabricate metal parts for ACT using certain molds located at

---

[4]In the interest of preserving the record for appeal, the court provides detailed findings of fact herein.

[5]The "ACT" plaintiff in this case was incorporated in and maintained a principal place of business in Tennessee.  As explained herein, following the sale of ACT's assets to Beach and Manown in July 2007, Beach and Manown incorporated a new entity in Florida called "Advanced Concrete Tools Company, Inc.," with a principal place of business in Florida.  (*See* PX-13.)

[6]Certain evidence in the record indicates that, while under the Fraziers' stewardship, the company changed its name several times between 1996 through 2007.  (*See* DX-43.)  Because these name changes are immaterial, the court will refer to the company only as "ACT."

Perfection's facility.[7]  There is no written record of this agreement.  After Mr. Frazier died and Mrs. Frazier took over the business, Perfection continued to mold these parts for ACT.  At an unspecified point before June 2007, Barbrey and his business partner passed away and Jim McKee, that business partner's son, became the owner of Perfection.

In addition to Mrs. Frazier, as of June 5, 2007, ACT employed National Sales Manager Carl Ellis (employed from approximately 2002 through June 2007), Marketing Director Sherie Ellis, Production Manager and Quality Controller Steve Brown, and one other unspecified employee.  For the fiscal years 2004-2006, ACT made approximately $1 million to $1.2 million in gross sales per year, and Mrs. Frazier individually received between approximately $75,000 and $145,000 per year.  (*See* DX-31.)

As the Sales Manager, Carl Ellis maintained relationships with ACT's independent representatives across the country.  Mr. Ellis evaluated the performance of sales representatives periodically and issued 30-day termination warnings to any representatives who were "not doing their job."  As of the date he quit on June 22, 2007, Mr. Ellis believed that ACT's screed was the best available in the United States and estimated that ACT had approximately 40% of the screed market, representing a substantial plurality of the market.

## II.    Engine Cracking Issue and Modifications to the Black Beauty and Silver Beauty

An essential component of the Black Beauty and Silver Beauty screeds is its engine. Prior to closing, ACT purchased Honda-branded engines for use on its screeds from "MTA Distributors," an exclusive dealer for Honda engines in the region.

---

[7]The record contains references to this molding company both as "Perfection Molders" and as "Precision Molders."  Paragraph 14 of the APA refers to this entity as "Perfection Molders," which appears to be the correct name.

To ensure that Honda will warrant an engine for a particular use, Honda requires that the manufacturer of a product using the engine provide product specifications and testing reflecting the use of the engine in a particular application. Prior to the sale of ACT's assets in 2007, Henry Procopio, an Application Engineer for MTA Distributors, collected that data, performed testing on Honda's behalf, and submitted the information to Honda for approval. In 1998 and 1999, based on ACT's design specifications in place at the time, Honda approved for warranty coverage its "GX22" engine for use in the Black Beauty and Silver Beauty screeds. (*See* DX-16 (1/15/98 approval letter); DX-17 (7/31/99 letter to Honda from Procopio).) At some point in 2003 or 2004, ACT experienced a problem with the cracking of the engine casing from ball bearings. ACT changed the ball bearings it used, which alleviated this problem.

In 2005, Procopio tested the screeds using a Honda "GX25" engine. On or about April 23, 2005, Procopio tested the Silver Beauty. (*See* DX-19.) At the time, the screed did not have a urethane block installed behind the fuel tank just underneath the engine.[8] Honda warranted its engines for use in this version of the Silver Beauty on June 9, 2005. (*See* DX-19 at p. 1; DX-20 at p.1.) On or about December 27, 2005, Procopio again tested the Silver Beauty with a "GX25" engine. (DX-18.) This version similarly did not have a urethane block underneath the engine. On June 24, 2006, Honda warranted its engine for use in this version of the Silver Beauty. (*Id.* at

---

[8]Although Procopio was asked to testify about matters presumably within his area of expertise, Procopio's direct testimony was not a model of clarity and contained certain internally inconsistent statements. Follow-up questioning by both parties substantially clarified Procopio's testimony. For example, with respect to the issue of the urethane block, Procopio eventually clarified that the 2005 version of the screeds that he tested contained a urethane block on the shaft of the screed but not underneath the fuel tank and the engine, which is a crucial distinction for purposes of this case.

Within approximately twelve to eighteen months of the closing, Frazier, Ellis, and Brown became aware of an issue with the screeds. Because of excessive vibration when running the screeds, the housing of the engine for certain screeds had begun cracking. Although ACT attributed some of the cracked screeds to "user error." At some point between December 27, 2005 (the date that Procopio tested the previous version of the Silver Beauty) and June 5, 2007 (the date of the APA), ACT changed the motor mount design for both the Silver Beauty and the Black Beauty screeds. Specifically, ACT mounted a urethane block underneath the engine to reduce the cracked engine problem. ACT did not have this new design retested by Honda, although MTA Distributors continued to sell the redesigned product without raising any concerns to ACT.

At an unspecified point before or within a few weeks after the closing, Brown discussed the cracked engine casings issue with Kelvin Scott and/or Gilmore.

Prior to the closing, no one at ACT regarded the cracked engines issue as a serious concern. Brown believed that it was not a major problem and, in fact, Brown was interested in purchasing the company once Mrs. Frazier offered it for sale. For his part, Mr. Ellis was under the (mistaken) impression that Honda had warranted its engines for use in the redesigned screeds. At any rate, Mr. Ellis testified that issues related to engine cracking did not adversely impact sales.

Henry Procopio, the Application Engineer for Honda engines utilized in ACT's screeds,

---

[9]It is not clear from the record why Procopio tested the Silver Beauty and submitted warrant applications for the Silver Beauty twice in the same year.

would have been made aware of warranty issues related to the urethane isolation block before the closing. Procopio testified that he was not aware of any warranty declines by Honda because of the urethane block. In fact, between 2005 and the closing in July 2007, only two warranty claims were made on ACT's screeds relating to engine conditions generally.[10]

### III.     Offering of ACT for Sale

In March 2007, Harvey Gardner, who had worked for ACT in the early's 2000s before Mr. Frazier's death, approached Mrs. Frazier to ask if she would be willing to list ACT's assets for sale on the internet. Mrs. Frazier, who had a minor child and was caring for an aging parent at the time, stated that she would be willing to sell the company. In return for a fee, Gardner agreed to market and facilitate the sale of the company's assets to any interested party.[11] There is no evidence in the record indicating that Mrs. Frazier chose to offer ACT's assets for sale for any reason other than her personal desire to care for family members after profiting from the sale. More specifically, the record contains no evidence that Mrs. Frazier intended to sell the company's assets because of some perceived problems with ACT's existing operations or its future business prospects.

On April 1, 2007, Gardner prepared a Business Sale Prospectus ("Prospectus") (DX-43), which represented to potential purchasers that (1) ACT had made $1-$1.2 million in gross sales per year for fiscal years 2004-2006, from which the owner had received cash payouts between $74,989 and $144,849 per year, (2) ACT had sales agreements with approximately 600

---

[10]Procopio clarified on redirect that he had no specific knowledge about warranty claims made after the closing, because Florida (where Beach and Manown moved ACT's assets) was outside Procopio's geographic jurisdiction.

[11]During his testimony, Gardner described himself as a "seller's agent" for ACT.

construction supply houses in "all 50 states"; and (3) ACT had sales agreements with 18 manufacturer's representative firms "who have sales representatives calling on the Company's dealers in all 50 states." The Prospectus advised that it "[a]ssumes the buyer is fully knowledgeable about the company and its operations and will conduct a rigorous due diligence to verify all purported facts, estimates, calculations, and suppositions, and not rely solely on this document to support a purchase decision." The company was listed for sale for approximately $995,000.[12]

## IV.    Beach and Manown's Offer to Purchase ACT

Beach has a B.A. in Economics and also took some post-graduate business courses. Prior to the purchase of ACT's assets, Beach had worked as an executive for Raytheon for approximately 20 years and thereafter for a commercial laundry manufacturer called Unimac. While at Unimac, Beach worked with Gilmore, who was Unimac's Director of Engineering. Gilmore holds an undergraduate degree in electrical engineering and worked for Unimac from 1986 through 2001, when Gilmore began operating Manown Engineering, a precision manufacturing company located in Bonifay, Florida.

After Beach left Unimac, he maintained a relationship with Gilmore, whereby he and Gilmore explored potential business operations to add to Manown's existing business portfolio. In approximately March 2007, Beach saw the advertisement for ACT on the internet. After some type of preliminary investigation, he contacted Gilmore to explore the possibility of purchasing ACT's assets to add to Manown's existing operations.

---

[12]The trial record does not contain a written record of the original offering price. However, the court credits Gardner's testimony that the original offering price was approximately $995,000.

After Beach and Gilmore received the Prospectus from Gardner, Beach met with Gardner at Gardner's house (located near Nashville) for approximately two hours in late April 2007. Beach and Gilmore also went to Gardner's office to review records relating to ACT, including drawings, financial statements, and other records. During these meetings, Gardner did not express to Beach or to Gilmore any problems with the quality of ACT's screeds. Beach was told that the product was "problem free" and that there had been no warranty incidents.

At some point before June 5, 2007, Beach and Gilmore negotiated with Gardner to purchase ACT's assets.[13] Rather than pay a lump sum purchase price of approximately $995,000 at or soon after the closing, Beach and Gilmore offered to pay a purchase price of $1.1 million – more than ACT's offered price – in return for splitting up the payments into (1) a payment of $600,000 at or soon after the closing; and (2) payments of the $500,000 balance as a percentage of gross sales of certain products (including ACT screeds) after the closing. To finance their proposed up-front portion of the purchase price, Beach and Manown obtained a bank loan, with respect to which they made personal guarantees and provided a prospective lien on ACT's assets (once purchased) and Manown's existing assets. Frazier accepted Beach and Manown's offer.

## V.    The Asset Purchase Agreement, the Amendment, Pre-Closing Activity, and the Closing

### A.    The APA and the Non-Compete and Non-Solicitation Agreement

On June 5, 2007, approximately six weeks after the first meeting with Gardner, the parties entered into an Asset Purchase Agreement for the purchase of ACT's assets. (*See* DX-1.) Beach understood the transaction to involve the purchase of all of the ACT assets necessary and

---

[13]The record shows that Mrs. Frazier delegated to Gardner full authority to negotiate on ACT's behalf.

sufficient to produce and market ACT's products. Mrs. Frazier (on behalf of ACT), Gardner (as "Business Broker"), Beach, and Darwin Gilmore (on behalf of Manown) signed the agreement.

The APA conveyed to Beach and Manown "all equipment, fixtures, goodwill, inventory, trademarks, trade names, and other intangible assets and the business." (*Id.* at p. 1.) The APA specifically conveyed, among other things, (1) all "machinery and equipment" identified in an attached exhibit (*id.* ¶ 1(a), incorporating Ex. A), (2) "[a]ll tools, dies, and fixtures owned by" ACT" (*id.* ¶ 1(b)), (3) "processes, patents, patent applications, trademarks, signs, advertisements, copyrights, drawings, logos, web addresses and domain names" identified in an attached exhibit (*id.* ¶ 1(c), incorporating Ex. B), (4) the corporate trade name "Advanced Concrete Tools, Inc." and all other trade names identified in an attached exhibit (*id.* ¶ 1(e), incorporating Ex. C), (5) all customer lists (*id.* ¶ 1(f)), and (6) ACT's goodwill (*id.* ¶ 1(g).)

Paragraph 4 of the APA provides as follows:

(a) <u>Purchase Price</u>. The purchase price for the Assets to be purchased hereunder shall be $1,100,000 00/100 Dollars ("Purchase Price"). To be paid as follows:

    (i) $10,000.00 deposit to be included in cash payment

    (ii) $600,000 total cash payment at closing

    (iii) Plus 2% of gross sales of screeds, screed bars, saddle clamps, concrete bomb, and other screed related products sold by Advanced Concrete Tools Inc. at the time of closing of this transaction until seller has been paid $500,000. Annual payments shall begin after 2008 and shall be based on gross sales reported on the Buyer's Federal Income Tax Return beginning with year 2008 and each year thereafter. Payment shall be due on or before March 1 of each year.

Both sides also made representations and warranties in the APA. In most relevant part, ACT (the "Seller") represented as follows:

Seller makes the following representations and warranties to Buyer [collectively, Beach and Manown], each of which is true and correct on the date hereof, shall remain true and correct to and including the Closing Date, shall be unaffected by any investigation heretofore or hereafter made by Buyer, or any knowledge of Buyer other than as specifically disclosed in the disclosure schedules delivered to Buyer at the time of the execution of this Agreement, and shall survive the Closing of the transaction provided for herein.

(a)     Authority. . . . Seller has complete power to own and to sell, transfer and deliver all assets to be transferred hereunder and instruments to be executed to vest effectively in Buyer good and marketable title to the Assets.
        . . .

(d)     Assets.

        (i)     Exhibit A hereof contains a complete and accurate list, as of the date hereof, of certain assets owned or leased by Seller which are used or useful in the operation of the Business and which are being purchased by Buyer.

        (ii)    On the Closing Date, Seller shall have good and marketable title to all the Assets, free and clear of all mortgages, liens [], security interests, claims, . . . or any rights of any third parties of any nature whatsoever [].

        (iii)   All tangible assets constituting Assets hereunder are in good operating condition and repair, free from any defects (except such minor defects as do not interfere with the use thereof in the conduct of normal operations of Seller), have been maintained consistent with Seller's historical practice and are sufficient to carry on the business of Seller as conducted during the preceding twelve months.
        . . .

(k)     Client Relations.  There exists no condition or state of facts or circumstances involving the Seller's clients that Seller can reasonably foresee could adversely affect the Business after the Closing Date.  To Seller's knowledge, the Business may be maintained after the date hereof in the same manner in all respects (financial and otherwise).

(l)     Absence of Certain Changes.  Since April 26, 1996 Seller has operated the business in the ordinary course consistent with historical practice.

        . . .

(n) <u>General Representation and Warranty</u>.  Neither this Agreement nor any other document furnished by Seller in connection with this Agreement contains any untrue statement of a material fact or omits to state any material fact necessary to make the statements contained herein or therein not misleading in any material respect.  There is no fact or circumstance known to Seller which materially adversely affects, or in the circumstance known to Seller which materially adversely affects, or in the future, as now reasonably foreseeable, is likely to materially adversely affect the condition (financial or otherwise), properties, assets, liabilities, business, operations or prospects of the Business which has not been set forth in this Agreement or the schedules hereto.

(o) <u>Disclosure</u>.  No representation or warranty by Seller in this Agreement, nor any statement, certificate, schedule, document or exhibit hereto furnished or to be furnished by or on behalf of Seller pursuant to this Agreement or in connection with the transactions contemplated hereby, contains or shall contain any untrue statement of material or omits or shall omit a material fact necessary to make the statements contained therein not misleading.

(APA ¶ 10 (emphasis added).)  ACT did not disclose the engine cracking issue or the updated but unapproved screed design in any disclosure schedule.  In fact, the record contains no disclosure schedules at all.  The court therefore finds that ACT did not submit additional disclosure schedules to Beach and Manown.

Beach and Manown (the Buyers) made the following corresponding representations and warranties in APA ¶ 11:

(d) <u>Client Relations</u>.  There exists no condition or state of facts or circumstances involving the Buyer that Buyer can reasonably foresee could adversely affect the Business after the Closing Date.  To Buyer's knowledge, the Business may be maintained after the date hereof in the same manner in all respects (financial or otherwise).[14]

---

[14]In the same vein, ACT made a similar promise in ¶ 13:

<u>Conduct of Business Pending the Closing Date</u>: Seller shall use its best efforts to preserve for Buyer its present relationships with customers and others having business relationships with Seller that pertain to the Business.  Seller will immediately notify Buyer if there is the loss or expected loss or other disruption of

(f)     General Representation and Warranty: Neither this Agreement nor any
other document furnished by Buyer in connection with this Agreement
constitutes any untrue statement of a material fact or omits to state any
material fact necessary to make the statements contained herein or therein
not misleading in any material respect.  There is no fact or circumstance
known to Buyer which materially adversely affects, or in the future, as
now reasonable [sic] foreseeable, is likely to materially adversely affect the
condition (financial or otherwise), properties, assets, liabilities, business,
operations, or prospects of the business.

(APA ¶ 11(d) and (f) (emphasis added).)  In Paragraph 12, entitled "Rights of Indemnification,"

the parties also agreed as follows:

(a)     Survival of Covenants, Warranties, and Representations. All covenants,
agreements, representations and warranties of the parties under this
Agreement, in any exhibit or certificate or other document delivered
pursuant hereto, shall remain effective through and shall survive the
Closing Date for one (1) year as provided for herein regardless of any
investigation at any time made by or on behalf of Buyer or of any
information Buyer may have with respect thereof

(b)     Indemnification of Buyers. Seller shall defend, indemnify and hold Buyer
harmless from and against . . . (1) any and all claims, liabilities and
obligations of every kind and description, contingent or otherwise, arising
from or relative to (B) a breach of any of Seller's representations,
warranties or covenants hereunder . . . .

(*Id.* ¶¶ 12(a) and (b).)

The parties also agreed to certain "conditions" precedent before Manown and Beach

would close on the proposed sale:

14.     Conditions Precedent to Buyer's Obligations.  The obligation of Buyer to
consummate the transactions contemplated hereunder is subject to the
satisfaction at or prior to the Closing of the following (unless waived in
writing by the Seller):

(a)     Representations, Warranties and Covenants.  The representations,

---

any relationship between Seller and a vendor, customer or employee.

warranties and covenants of Seller contained in this Agreement
shall be true and correct in all material respects at and as of the
Closing Date as though made at and as of the Closing Date, except
for changes contemplated by this Agreement.

. . .

(b)    <u>Agreement with Suppliers</u>. Buyer shall have reached agreement
with Perfection Molders Inc. and other suppliers (Exhibit F) to
supply parts to Buyer under the terms currently provided to the
Seller.

(APA ¶ 14.)  The APA also contained a provision specific to ACT's employees:

18.    <u>Employees</u>.  Buyer shall not be required to employ any employees of Seller and
shall be responsible for the termination of any employees it does not desire to
retain following Closing.  To the extent Buyer desires, it shall have the
opportunity to interview any of Seller's employees or independent contractors for
possible employment by Buyer upon such terms and conditions as Buyer
determines.  Such interviews shall take place prior to Closing with the consent of
Seller, which shall not be unreasonably withheld.  After [the] Closing Date, Kim
Frazier shall act as a consultant for a period of time and amount of compensation
to be agreed upon between the parties and shall work at the World of Concrete to
be held in February, 2008.

The agreement also contains the following merger clause:

21.    <u>Entire Agreement</u>.  It is understood and agreed that all understandings and
agreements heretofore made between the parties hereto are merged in this
Agreement which alone fully and completely expresses the agreement between the
parties hereto and that this Agreement has been entered after full investigation,
neither party relying upon any statement or representation which is not herein
contained.  This Agreement may not be changed or terminated orally.

Finally, the agreement contained the following assignment clause:

This Agreement may not be assigned by Seller or Buyer without the prior written
consent of the other party, which consent shall not be unreasonable withheld.

(APA ¶ 25(c).)  The APA contains no acceleration clause.

On June 5, 2007, the contracting parties also entered into a Non-Competition and Non-

Solicitation Agreement.  (DX-29.)  In most relevant part, the agreement contains the following

term:

> No Additional Payment Required. Sellers acknowledge and agree that the payment of the Purchase Price constitutes sufficient and adequate consideration and that no additional or independent consideration is necessary for the execution, delivery and performance of this Agreement.

**B.     The APA Amendment**

On July 1, 2007, the parties agreed to an Amendment relating to the purchase price provision.[15]  In most relevant part, the Amendment changed the terms of payment, including (1) spreading the up-front $600,000 payment across the first 90 days after closing;[16] and (2) provided that payments toward the remaining $500,000 – as a 2% percentage of gross sales – would take place *quarterly* beginning 15 months after closing.  The Amendment also specified a July 10, 2007 closing date.  Accordingly, the court finds that, as amended, the APA obligated Beach and Manown to make quarterly payments as a percentage of gross sales starting on or about October 10, 2008.  Beach stated that he restructured the deal in this fashion for purposes of financing, to attract long-term investors in the venture.

**C.     Additional Investigation and Due Diligence by Beach and Manown**

Between signing the APA on June 5, 2007 and the closing on July 10, 2007, Beach and Manown conducted additional due diligence regarding ACT.  They had full access to all of ACT's records, including, *inter alia*, sales records, warranty records, and financial information.

---

[15]The Amendment purports to replace ¶ 3 of the APA.  As is readily evident from comparing the APA and the Amendment, the court finds that the Amendment was actually intended to replace ¶ 4 of the APA.

[16]Beach and Manown promised to place $10,000 in escrow as a deposit, to pay $290,000 on the date of closing, to pay $200,000 within 60 days of the closing, and to pay $100,000 within 90 days after closing, for a total of $600,000.  It is undisputed that Beach and Manown timely made those payments.

They also had full access to ACT's marketers and suppliers. Frazier and Gardner led Beach and Manown through a walkthrough of ACT's facility.

ACT also granted Beach and Manown full access to ACT's facility and production processes. Kelvin Scott, an experienced machinist for Manown, made four trips to ACT, where he was trained by ACT's existing employees about ACT's products. He recalled spending approximately one week of training with Brown at the facility. Brown explained to Scott where ACT bought the parts for the screeds, how ACT assembled them, and how ACT handled warranty and repair requests by customers. At some point, Gilmore also accompanied Scott to ACT's assembly plant. During at least one of his trips to ACT's facility, Scott saw three crates of "cracked" screed motors, which ACT had kept to use for parts. Brown also mentioned to Scott that ACT had experienced some "issues" with cracks, although Scott did not inquire as to how often that problem had occurred. In fact, during one of Scott's trips, a customer called about a broken housing on the screed motor, and Brown told the customer that ACT would send it a new motor. Scott took the three crates of cracked screeds with him, but he did not report the matter to Beach or Manown.

Gardner also took Beach to Atlanta to visit with Corey Oaks at Sun Marketing, one of the marketing firms whose representatives marketed ACT's products. Gardner and Beach did not tell Mr. Ellis about the visit. Gardner testified that he, Beach, and Oaks "discussed" Carl Ellis, but Gardner could not recall any specifics. Mr. Ellis later questioned Beach about why he (Beach) and Gardner had traveled to Atlanta without him, given that he (Mr. Ellis) had the existing relationship with the representatives in that area.

Also, Mrs. Frazier, along with Beach and/or Gilmore, went to meet Jim McKee at

Perfection to show Beach and Gilmore how certain screed parts were molded, using molds located at Perfection's facility.[17]  Going into that meeting, Mrs. Frazier believed that, pursuant to an oral agreement between Roy Frazier (her late husband) and the (by then) deceased Terry Barbrey at Perfection, ACT owned the molds.  Mrs. Frazier testified that, during the meeting with McKee, McKee stated that ACT did not own the molds and that it was his (McKee's) belief that Perfection owned the molds. In contrast, Beach testified that the ownership issue never came up. For his part, Gilmore testified that those present did not have "detailed discussions" concerning ownership of the molds, which the court construes as suggesting that the issue was discussed to some degree.  The court credits Mrs. Frazier's recollection of events, which can be construed consistently with Gilmore's testimony.

ACT also permitted Beach and Manown to take a machine back with them to take apart and analyze.  Within 7-10 days after the APA was signed (on June 5, 2007), Beach and/or Manown also met at least twice with Carl Ellis, the Sales Manager for ACT.  Mr. Ellis told Beach and Gilmore that ACT's screed was the best on the market, describing it to them as the "Cadillac" of available screeds.  Mr. Ellis also told Beach and Gilmore that ACT's screed was more expensive than most of its competitors' products, requiring aggressive upselling to maintain sales.  According to Mr. Ellis, when the defendants purchased ACT, it had approximately 40%

---

[17]In Gilmore's deposition and during the testimony of certain witnesses at trial, witnesses and counsel for the parties at times seemed to utilize the terms "tools," "dies", and "molds" interchangeably.  (*See, e.g.*, Gilmore Dep. at 10:18-22 ("Q: Did you have any decisions with respect to ownership of the tools or dies, presses or any of the other equipment that was used to create . . . the molds that were being used by Advanced Concrete?"); Frazier Dep. at 49:16-19 ("Q: Does Advanced Concrete Tools own the molds that are used in the manufacture of the tools or the parts in this screed?") and 50:13 ("A: I said, [']Who owns the molds[?'].  And he said, '[W]e own them.'").)  For simplicity only, the court will utilize the term "molds" herein.

market share in a highly competitive market that included approximately 14 competitors, three to four of whom were "main players."

An employee of Manown named "April" (whose last name is not identified in the record) spent approximately one week at ACT's Hendersonville facility, where she had full access to, and examined, ACT's business records, including warranty data, sales data, representative files, bills, and the like. Ms. Ellis recalled showing April where these files were located and reviewing them with her. Ms. Ellis did not recall that April or anyone else asked any questions about warranty information, although Beach and Manown appropriated all of ACT's warranty data (both electronic and hard copy) in connection with the closing.

At some point before June 22, 2007, Mrs. Frazier took a pre-planned vacation to Italy with a group of students. Before she left, she expressed orally to Beach and Manown that Mr. Ellis (the Sales Manager for ACT) was a critical employee of ACT and that certain customers might only deal with Mr. Ellis. At the time Mrs. Frazier left for Italy, she believed that Beach and Manown would hire Mr. Ellis, although the contract did not require him to be retained. Beach and Gilmore had discussions with the Ellises about continuing to employ them at a separate office in Tennessee, informing the Ellises that they might employ them after the closing. However, during the period between signing the APA and the closing on June 22, 2007, Gardner made "very disparaging" remarks to Beach about Mr. Ellis, causing Beach to question whether he (Beach) could work with Mr. Ellis going forward.

On or about June 22, 2007, while Mr. Ellis was traveling to Saint Louis on business, a competitor company called to offer him a job. Mr. Ellis and Beach dispute what happened next. According to Mr. Ellis, he immediately called Beach and demanded to know whether Beach

intended to continue to employ him after the closing and who would "be in charge," referring to whether Mr. Ellis or Gardner would be in charge of sales and marketing after the closing. According to Mr. Ellis, Beach refused to promise Mr. Ellis that he would employ him, stating that he (Beach) needed to speak with Gilmore first. Mr. Ellis was undergoing treatment for cancer at the time and wanted an immediate promise of employment from Beach, which he did not get. Mr. Ellis completed a sale of equipment that evening (his last for ACT) and informed Beach that he was quitting immediately. By contrast, Beach testified that the initial conversation did not occur and that it was "invented out of whole cloth" by Mr. Ellis. Based on a credibility determination, the court credits Mr. Ellis's recollection of events.

### D. The Closing

On July 10, 2007, the parties closed the sale. The parties executed several documents as part of the sale, including (1) a Bill of Sale (DX-3), (2) an Assignment and Assumption Agreement (DX-4), and (3) a Closing Statement (DX-5). According to Gardner, the law firm of Baker, Donelson, Bearman, Caldwell & Berkowitz ("Baker Donelson") prepared the APA and these closing documents.

The Bill of Sale incorporated the terms of the APA by reference and conveyed all of ACT's "right, title and interest in all of the assets used or which may be useful in the operation" of ACT identified in an attached Exhibit A. Exhibit A essentially identified "Assets" set forth in the APA, including, *inter alia*, "[a]ll tools, dies, and fixtures of Advanced Concrete Tools, Inc." (*See* Bill of Sale, Ex. A.)

The Closing Statement set out the payments made or to be made as a condition of the sale, as follows:

| | |
|---|---|
| Purchase Price | $1,100,000.00 |
| Less Indebtedness to be paid | -500,000 |
| | -200,000 |
| | -100,000[18] |
| Less Escrow Deposit | -10,000 |
| Reimbursement for Reservation Deposit | +8,025.00 |

Between April 2007 and the date of the closing in July 2007, ACT engaged in normal business operations consistent with past practices, except for Mr. Ellis leaving the company on or about June 22, 2007.

## VI. Post-Closing Developments

For one month following the closing, Mrs. Frazier stayed on with ACT as a consultant for Beach and Manown, working without pay. ACT hired Gardner as a consultant to handle sales and marketing. After Frazier worked for one month as a consultant for ACT following the closing, Beach had no further contact with Frazier (until August 2009) because he "saw no need" to speak with her for any reason.

In connection with the closing, Beach and Manown moved ACT's assets and business operations to Manown's facility in Bonifay, Florida. Beach and Manown also incorporated a new entity in Florida, entitled Advanced Concrete Tools Co., to which it transferred the assets acquired at closing.[19] Beach owned a 50% interest in the stock of this Florida-based ACT entity. At an unspecified point, apparently at the advice of an accountant, Beach created an LLC to

---

[18] The "-200,000" and "-100,000" items correspond to the $200,000 payment due within 60 days of closing and the $100,000 payment due within 90 days of closing under the Amendment to the APA.

[19] The new ACT entity was apparently an S Corporation. (*See* DX-11.)

which he transferred his 50% interest in ACT's stock.[20]

Following the closing, ACT ran into immediate business and operational problems. First, despite Gardner's efforts, two major customers ceased doing business with ACT in favor of competitors. Second, because Perfection claimed to own the molds, Beach and Manown were essentially limited to working with Perfection, and they could not shop for a better deal with other companies. Beach and Manown were wary of suing Perfection to clear title to the molds, because a lawsuit might have disturbed the crucial but sensitive relationship between ACT and Perfection. Third, ACT ran into "distribution issues" with its representatives, who apparently were not as responsive to Gardner as they had been to Mr. Ellis. Fourth, Mr. Ellis began working for a competitor, which drew customers away from ACT. Fifth, ACT received complaints from customers about cracked housings on the motors and that Nissan was refusing to warrant the engines because ACT had (during the Frazier era) unilaterally modified the design to add the urethane block.

With respect to the warranty complaints, Scott recalled that Brown came down to Bonifay within a week or two after the defendants moved ACT's operations to Florida, during which time ACT (now under Beach and Manown) had already received complaints about motors cracking. At some point thereafter, the company redesigned the screeds without the urethane block, based on ACT's original screed designs. Following that design change, complaints about motor

---

[20]In support of ACT's argument that Beach transferred assets in violation of the APA (by failing to obtain Frazier's approval), ACT's counsel elicited testimony from Beach concerning these post-closing transactions. Because ACT's counsel did not probe the issue in significant detail, the precise nature and timing of these transactions is not clear from the record. At any rate, as explained herein, any lack of clarity in the record regarding these particular transactions is immaterial.

cracking subsided.[21]

Also, on an unspecified date between July 19, 2007 and November 2007, Gilmore wrote to Procopio to inform him that, based on recent testing Gilmore had performed, the vibrations were much higher on the Black Beauty than had been reflected in the Silver Beauty test results that Gilmore had previously received from Procopio. According to Gilmore, he had not located any test results for the current configuration of the Black Beauty. On November 5, 2007, Procopio informed Gilmore that ACT (while under Mrs. Frazier) had added the urethane block after Procopio had last tested the Black Beauty and Silver Beauty, meaning that "the machine requires a complete retest" before Honda would warrant it. (*See* DX-20.)

During the bench trial, Beach did not present evidence quantifying the magnitude of the "cracked engine" problem. Scott testified that, soon after the closing, approximately 90% of the complaints from screed users related to cracked engines, but he did not articulate how many calls he received or how much money the company spent in addressing those complaints. According to Beach's testimony, which the court credits on this particular fact, ACT lost a single customer in Wisconsin because Honda had refused to warrant the redesigned screed. The record does not indicate how much business ACT lost as a result of the loss of this particular customer. Beach did not identify any other customers that ACT lost.

Gardner worked for ACT for six months following the closing. According to Gilmore, Gardner had represented that he was a "very skilled salesperson," a representation that "didn't

---

[21]The record is muddled as to when this design change took place. At one point, Beach testified that ACT redesigned the product in advance of the February 2008 "World of Concrete" convention. At another point, Beach testified that ACT was still attempting to redesign the product as of the fourth quarter of 2008. Beach also testified that ACT reached some agreement using a Honda-brand motor in 2011, during which time the product was still "in transition."

prove positive in any case." (DX-33 at 32:17-20.) At some point, Gardner recommended firing all of the independent sales representatives in favor of direct sales from ACT. It does not appear that Beach and Manown adopted this approach. About six months after the closing, Beach and Manown terminated Gardner, albeit on "good terms." During the time frame in which Gardner worked for ACT after the closing, Beach never complained to Gardner that Frazier/ACT had made any misrepresentations in connection with the closing.

During the latter half of 2007, ACT's sales plummeted and never fully recovered. The company's business decline forced Beach to invest substantial personal assets into ACT in 2007 and 2008. The economy also declined in 2008, which impacted the contracting industry that utilizes ACT's products. The company reported businesses losses of approximately $120,000 in 2007, $218,000 in 2008, $100,000 in 2009, $50,000 in 2010, $56,000 in 2011, $35,000 in 2012, and $51,000 in 2013. (*See* DX-7 to DX-15 and DX-46.) Beach did not present any expert evidence attempting to quantify the relative impacts of the different problems that ACT encountered after the closing, such as the economic decline, the Honda warranty issues, the loss of customers to Mr. Ellis, and, for that matter, Beach and Manown's own business decisions in running the company.

Although the company was not performing as Beach and Manown had expected, ACT continued to generate some screed-related revenue. Beach calculated that the following figures, which the court finds credible, reflect 2% of the gross sales to which ACT (Frazier) was otherwise entitled under the APA and the Amendment: (1) 2008: $1,500.11; (2) 2009: $8,338.46;

(3) 2010: $7,096.29; (4) 2011: $7,620.56; (5) 2012: $7,407.22; and (6) 2013: $4,945.51.[22]  (DX-39.)  Although Beach and Manown were otherwise obligated to pay these amounts to Frazier on a quarterly basis beginning October 2008, Beach and Manown never made any payments, nor did they provide tax returns or any other financial records to Frazier between the closing date and the date this lawsuit was filed.  The contract unequivocally required Beach to pay royalties to Frazier beginning 15 months after closing.  (*See* APA ¶ 4(a).)  It is undisputed that ACT failed to pay these royalties at any time.  Therefore, the court finds that, as a matter of fact, Beach's failure to pay constituted a breach of the APA.[23]

Mrs. Frazier testified that, at some point soon after failing to receive the October 2008 payment (*i.e.*, the first default), she attempted to contact Beach and Manown "many times", including multiple emails, to inquire about payment.  Mrs. Frazier did not receive any response to her requests until August 2009, when she received a letter from Beach.[24]

In the letter (PX-6), Beach stated in substance that "ACT is basically insolvent" and that

---

[22]There was a potential discrepancy between the position initially taken by Beach's counsel concerning the appropriate sales to include in these calculations and the manner in which Beach himself calculated it.  Beach included all screed sales in his calculations, regardless of whether the screeds had been modified after the closing, whereas his attorney had previously suggested that those post-modification sales should be removed from that calculation.  Given that Beach himself adopted a more generous calculation of the screed sales subject to the Purchase Price provision of the APA, the court will utilize Beach's figures.  The court also notes that Beach arguably should have included late 2007 sales in his calculation.  Be that as it may, the court regards that omission as inadvertent, neither of the parties raised the issue during the bench trial, and, at any rate, the precise figures are immaterial in light of the court's findings herein.

[23]The court discusses herein whether, as a matter of law, Beach's breach was excusable based on ACT's (alleged) earlier breach or breaches of the APA.

[24]The letter is undated.  However, based on testimony at the bench trial, the court finds that the letter was sent in August 2009.

"it will not survive beyond this year without heroic efforts to diversify and increase sales." In addition to acknowledging that the "sustained recession" had impacted the company, Beach cited multiple other factors for ACT's decline in business. First, he claimed that it was "irreparably damaging" to the company that the Ellises had left "without a non-compete and [gone] directly to a competitor" and that Mr. Ellis had "created as great a disruption to the business as he possibly could even before he formally resigned." Second, Beach claimed that, despite promises that ACT had manufacturer's representatives throughout the United States, there were "practically no manufacturing reps in the entire Western and Northeast United States and the relationship of the company with the major retailers and previous reps was in complete disarray." Third, Beach stated that Gardner had "wholly misrepresented his knowledge of the business," apparently in an effort to secure for himself "significant further compensation during the transition." Fourth, Beach stated that the motor cracking issue and the lack of warranty coverage had "seriously eroded" customer confidence levels. Fifth, Beach stated that the Black Beauty and Silver Beauty "are old designs," that the patents were "ineffectively written" and "have not been protected," and that competitors had introduced products that were "light and more highly featured and easier to use." According to Beach, "the product line is way out of its life cycle and is being overwhelmed in the marketplace" and ACT would "never return to the sales levels you enjoyed in previous years."

Beach also included a final list of factors, complaining that "the screed market is small and has shrunk dramatically," the "tremendous housing bubble" had ended, there were "too many competitors with improved products," average prices were barely above cost of production, and representatives and dealers did not want to carry ACT's product line. In the letter, Beach stated

that he and Manown "will defer" paying "funds that may be due" under the APA until they had completed a redesigned product line. He added that, "[i]f we do survive we [illegible] begin [illegible] possible to compensate you under the terms of our purchase agreement."[25] Notwithstanding Beach's representations about future payment, Beach and Manown did not subsequently make any quarterly payments to Frazier under the APA at any point.

The August 2009 letter reflected Beach's first post-closing communication to Frazier about an alleged breach of the APA. Prior to sending the letter, Beach had not complained to Frazier about the status of ACT in any respect.

At an unspecified point, likely in late 2010, Beach prepared a presentation for potential investors in ACT, which touted ACT's business prospects and network of dealers and representatives. The court credits Beach's testimony that this presentation reflected "puffery" designed to attract investors. Beach did not attract investors, nor did ACT sell any additional screeds as a result of the presentation.

Beach testified that he believes that, under the APA, he had no good faith obligation to continue to operate ACT after the closing. Nevertheless, the record shows that Beach did make a good faith (albeit unsuccessful) effort to make ACT profitable following the closing.

On October 13, 2010, Attorney Scott Hall (now ACT's counsel in this lawsuit), wrote a demand letter to Beach, accusing Beach of breaching the APA and demanding payment of the full balance of $500,000. Beach did not meet that demand. Twelve days later, ACT (via Mrs.

---

[25]The version of the letter in the record contains blanks for what may have been punch holes in the printout. It appears that this sentence would have read "If we do survive, we [will] begin [if, when, or as] possible to compensate you under the terms of the terms of our purchase agreement." (DX-6.)

Frazier) filed this lawsuit.

## CONCLUSIONS OF LAW

**I.**     **Legal Standard**

As stated in *White v. Empire Express, Inc.*, 395 S.W.3d 969 (Tenn. Ct. App. 2012):

> The interpretation of a contract is a question of law. *Allstate Ins. Co. v. Tarrant*, 363 S.W.3d 508, 526-27 (Tenn. 2012) [].  The cardinal rule of contract interpretation is to ascertain and give effect to the intention of the parties. *Christenberry v. Tipton*, 160 S.W.3d 487, 494 (Tenn. 2005).  In interpreting a contract, the court must look to the ordinary meaning of the language in the contract and determine whether the language is ambiguous. *84 Lumber Co. v. Smith*, 356 S.W.3d 380, 393 (Tenn. 2011) [].  If the contract language is clear and unambiguous, "the literal interpretation of the language controls the outcome of the contract disputes," and we must enforce the contract as written. *Planters Gin* [*v. Fed. Compress & Warehouse Co.*,] 78 S.W.3d [885], 890 [Tenn. 2002] [].  If the language at issue is ambiguous–that is, if its meaning is uncertain and is susceptible to more than one reasonable interpretation– the ambiguity is generally construed against the drafter of the contract. [] All provisions of the contract should be construed in harmony, "if such construction can be reasonably made, so as to avoid repugnancy between the several provisions of a single contract." *Rainey v. Stansell*, 836 S.W.2d 117, 119 (Tenn. Ct. App. 1992).

*White*, 395 S.W.3d at 714 (certain citations omitted).

**II.**     **Analysis of Alleged Breaches**

Each party contends that the other party breached the contract first.  Accordingly, the court must first attempt to fix the time of the various alleged breaches.

### A.     Alleged Breaches by Beach

ACT argues that Beach breached ¶ 25(c) of the contract by transferring the acquired assets without Mrs. Frazier's permission.  The parties do not dispute the underlying facts; instead, they dispute whether the contract should be construed to prohibit the underlying transfer of assets.  Accordingly, this contractual interpretation issue is a question of law for the court. *See Simpson v. Golden Serv. Realty & Auction, Inc.*, 1996 WL 732487, at *2 (Tenn. Ct. App.

Dec. 23, 1996) ("The issue of whether [the defendant] breached the contract requires interpretation of the parties' agreement. Contract interpretation is a question of law.") (citing *Rainey v. Stansell*, 836 S.W.2d 117, 118 (Tenn. Ct. App. 1992)). The plain language of ¶ 25(c) prohibits only assignment of "this Agreement," but it does not prohibit the transfer of assets subject to the agreement. Indeed, the parties to the agreement understood that Beach and Manown would be transferring the assets to a new "ACT" entity based in Florida following the closing. Accordingly, the court finds that the post-closing transfer(s) of assets by Beach and/or Manown did not constitute a breach of the APA.

Also, as alleged and as explained above, Beach breached the agreement as a matter of fact by failing to make quarterly payments at any time, even though he was obligated to do so beginning in October 2008.[26]

`    **B.     Alleged Breaches by ACT**

Beach argues that ACT breached the APA in multiple ways. The court addresses each contention in turn.

### 1.     Molds Located at Perfection Molders

Beach contends that ACT breached the terms of the APA and/or the Bill of Sale by failing to convey "free and clear" title to the molds located at Perfection Molders. The court has already found that, as a matter of fact, ACT did not convey clear title to those molds. Resolution of whether the lack of clear title constitutes breach of the APA requires the court to resolve the parties' competing interpretations of the contract, which involves a question of law.

---

[26]The court made this particular finding as a matter of fact because it did not involve any dispute concerning the appropriate construction of the APA's terms regarding Beach and Manown's payment obligation.

Paragraph 1(b) of the APA states that ACT was selling and that the Buyers were purchasing "Assets" that included, among other things, "[a]ll tools, dies, and fixtures *owned by the Seller*."  (APA ¶ 1(b) (emphasis added).)  Under the heading "Assets," ¶ 10(d)(ii) explains that, as of the closing date, "Seller shall have good and marketable title to all the Assets, free and clear of" essentially any claims by a third party thereto.[27]  No provision in the contract or in Exhibit A specifically identifies what "tools," "dies," or "fixtures" ACT actually owned (and was promising to transfer) as of the date of the sale.  Therefore, the APA contained no representation by ACT that it owned the molds at Perfection.  Similarly, the Bill of Sale conveys ACT's "entire right, title and interest in all of the assets" listed in an attached Exhibit A.  Exhibit A to the Bill of Sale includes a line item stating that "[a]ll tools, dies, and fixtures *of Advanced Concrete Tools, Inc.*" were subject to the Bill of Sale. (DX-3, Ex. 2 (emphasis added).)  As with the APA, the Bill of Sale does not identify what "tools", "dies", and/or "fixtures" that ACT actually owned at the time of sale.  In other words, the Bill of Sale purported to convey only the tools, dies, and/or fixtures that ACT owned on the closing date, without specifying what those assets were.  Accordingly, the court finds that the Bill of Sale contained no representation by ACT that it owned the molds located at Perfection.  By the same token, neither the APA nor the Bill of Sale can reasonably be interpreted as reflecting an agreement between ACT and Beach/Manown that those molds were being sold to Beach/Manown free and clear of any third party claim thereto.  Thus, even assuming that ACT did not actually own or have clear title to the

---

[27]Paragraph 1(a) of the APA also incorporates "[a]ll machinery and equipment, furniture and fixtures, and the like as set forth in Exhibit A attached hereto"; Exhibit A lists numerous specific items located at ACT's facility, including specific machinery (a "JET drill press"), office supplies (a "Stapler" in the conference room, and a "coffee maker"), and the like.

molds at time of sale – issues that have never been litigated – those molds were not an asset "of" ACT's at that time and, therefore, were not subject to the APA or the Bill of Sale.

Of course, if the parties did intend for the molds at Perfection to be among the assets conveyed free and clear of any third-party claim, they could and should have specified that in the APA or the Bill of Sale. The parties identified other assets conveyed down to the level of "staplers," a "coffee maker," and a specific "JET drill press." The lack of a similar specific reference to the particular molds at Precision reinforces the conclusion that whether ACT or Perfection owned the molds was not important to the transaction. What was important was to maintain the relationship with Perfection for the continuing supply of what Perfection fabricated for ACT. Indeed, in ¶ 14(d) of the APA, Beach and Manown expressly conditioned the closing on reaching an agreement with Perfection "to supply parts" to them "under the terms currently provided" to ACT. That condition was satisfied.

In sum, the court finds that any failure to convey clear title to the molds located at Precision did not constitute a breach of the parties' agreements.

### 2. Carl Ellis

Beach argues that ACT breached the "representations and warranties" section of the APA by failing to inform Beach and Manown in writing about how critical Carl Ellis was to ACT's business success. (*See* APA ¶ 10(k).) This argument fails for multiple reasons.

First, the terms of the contract itself preclude this argument. Paragraph 10(k) provides as follows:

> There exists no condition or state of facts or circumstances involving the Seller's clients that Seller can reasonably foresee would adversely affect the Business after the Closing Date. *To Seller's knowledge, the Business may be maintained after the date hereof in the same manner in all respects* (financial and otherwise).

(*Id.* ¶ 10(k) (emphasis added).)  Paragraph 11(k) contains a reciprocal promise by Beach and Manown, wherein they represented and warranted that:

> There exists no condition or state of facts or circumstances involving the Buyer that Buyer can reasonably foresee could adversely affect the Business after the Closing Date.  To *Buyer's knowledge, the Business may be maintained after the date hereof in the same manner in all respects* (financial and otherwise).

(*Id.*, ¶ 11(k) (emphasis added).)  Furthermore, under APA ¶ 18, Beach and Manown reserved the right *not* to employee ACT's existing staff, representing that they would have the opportunity to interview existing employees for "*possible employment* . . . upon such terms and conditions as Buyer determines."  (*Id.* ¶ 18 (emphasis added).)

The court finds that ACT represented in the APA only that, to the best of its knowledge, the business could have been maintained "in the same manner in all respects" following the closing, including as to client relationships.  Sensibly, ACT made no representation in ¶ 10(k) about what would happen if Beach and Manown chose to operate the company differently than it had operated under the Fraziers' stewardship, such as by retaining only some (or none) of the existing staff when the company changed ownership and moved to Florida.  Indeed, in the APA itself, Beach and Manown specifically represented that they were considering ACT's existing employees only for "possible" employment, at Beach and Manown's discretion; thus, reflecting real-world circumstances, Beach and Manown essentially acknowledged in the APA that ACT's existing employees were not among the "assets" transferred in the agreement.  Beach and Manown did not demand that any existing employees sign a non-compete agreement as a condition of closing the sale with ACT, nor did Beach and Manown require ACT to enter into some type of binding employment contract with its existing employees as a condition of the

closing.

When Mr. Ellis pressed Beach for a decision on whether Beach and Manown would employ him after the closing, Beach, apparently following what proved to be bad advice from Harvey Gardner, chose not to offer him an employment contract at that time. This turned out to be a poor business decision, but Frazier did not promise in the APA to make all future business decisions for Beach in the manner she believed would be best for the company's future prospects. All she promised was that, to the extent that Beach and Manown ran it in the same manner "in all respects," she was not aware of any present situation with ACT's clients that would adversely affect the business after the closing. The facts show that that representation was true and was never breached. By the same token, Beach and Manown's reciprocal representation in ¶ 11(d) confirms the court's interpretation of ¶ 10(k).

Ultimately, it is a bit rich for Beach to complain that ACT/Frazier should be held liable for "breaching" the contract by failing to advise Beach about Mr. Ellis's importance. The company was an open book for several months and employed only a handful of people. Mr. Ellis was the national Sales Manager for the company, responsible for maintaining relationships with the representatives and clients nationwide. His importance to the company was self-evident. Beach and Manown planned from the beginning to move the company's operations to Bonifay, Florida, far away from Carl and Sherie Ellis's residence in Tennessee. Beach and Manown reserved the right to evaluate and retain the existing staff at their own discretion, thereby acknowledging that (1) the Ellises were not contractually bound to remain with ACT, and (2) Beach and Manown would decide themselves whether to offer the Ellises post-closing jobs based on terms and conditions acceptable to both sides, if such terms could be reached.

Furthermore, with full knowledge about the employment status of the Ellises, Beach and Manown did not require ACT to procure non-competition agreements from the Ellises as a condition of the purchase agreement and/or the closing. Apparently heeding advice from Gardner – who had not worked for ACT for approximately five years – Beach contacted sales representatives and other customers after signing the APA and before the closing, without informing or otherwise involving Mr. Ellis. Beach also credited Gardner's disparaging remarks about Mr. Ellis and refused to offer Mr. Ellis an employment contract when Mr. Ellis pressed him. Thus, although terminating the Ellises (who were under no obligation to refrain from competing with ACT) presented potential risks to ACT's operations, Beach broke ties with the Ellises and left sales and marketing in Gardner's hands for approximately five to six months following the closing. Whether Beach and Manown's business decisions turned out to be good decisions or bad decisions – and, in hindsight, it seems like they were bad decisions – the APA did not obligate Mrs. Frazier to tell Beach and Manown how to run their own business operations.

3.    <u>Warranties/Product Defect Issues</u>

Beach argues that ACT breached the APA by conveying a product that was "defective" because, without any specific written disclosure by ACT, the screeds incorporated design changes that Honda had not approved for warranty purposes. In response, ACT has contended that (1) there is no expert proof that this design was "defective" in the first place; and (2) even to the extent there was an issue, Beach and Manown had every opportunity to discover it during the due diligence review.

As an initial matter, the APA does not contain any provision in which Beach and

Manown waived the right to contest a breach of the seller's representations and warranties based on their due diligence review. To the contrary, ¶ 10 specifies that ACT's representations and warranties were "unaffected by any investigation heretofore or hereafter made by buyer" and that any exception to ACT's representations would have to be in "disclosure schedules delivered to Buyer" on the date of the APA's execution. There were no disclosure schedules delivered to Beach and Manown when the APA was signed. Therefore, regardless of Beach and Manown's pre-closing investigation (whether before or after the execution of the APA), the contract bound ACT to its written promises in the APA.

The court has found, as a matter of fact, that ACT employees were aware of the engine cracking issue, that ACT made an unapproved design change that was not properly disclosed to Honda (either directly or through MTA Distributors), and that Honda refused to warrant its engines in the redesigned screeds after customers made warranty requests following the closing. Although it might have been helpful for Beach to present an expert concerning the impact of ACT's unapproved design changes, the court finds Procopio's testimony on this issue to be sufficient, and ACT has not persuaded the court that expert testimony was required to substantiate this alleged breach.

Accordingly, the court finds that ACT breached the APA by failing to disclose that it had deviated from the approved screed designs by adding a urethane block to alleviate engine cracking and by failing to inform Beach that Honda had not warranted the new application before the closing. Although Beach failed to quantify the magnitude of this issue during the bench trial, the court credits Scott's testimony that the company received a number of complaints shortly after the closing and Beach's testimony that ACT lost one customer after the closing

because of this issue.  Therefore, the court finds that this breach was material.

In sum, the court finds that (1) as a matter of law, ACT breached the APA by failing to disclose the unapproved design changes and the associated warranty issue to Beach and Manown; and (2) as a matter of fact, Beach and Manown later breached their duty to make quarterly payments to Mrs. Frazier starting 15 months after closing.

**III.**     <u>First to Breach Rule and the Doctrine of Waiver</u>

    **A.**     **Legal Standards**

Under the "first-to-breach" rule, "[a] party who has materially breached a contract is not entitled to damages stemming from the other party's later material breach of the same contract." *White*, 395 S.W.3d at 715 (quoting *McClain v. Kimbrough Constr. Co.*, 806 S.W.2d 194, 199 (Tenn. Ct. App. 1990)); *see also Madden Phillips Constr. Co., Inc. v. GGAT Development Corp.*, 315 S.W.3d 800, 812 (Tenn. Ct. App. 2009) ("[A] party who commits the first uncured material breach of contract may not recover damages for the other party's material breach.")  However, a party owed performance may waive its right to assert the first uncured material breach as a bar to recovery because of its own subsequent breach.  *White*, 395 S.W. 3d at 715-16; *Madden*, 315 S.W.3d at 812.  In particular, a party may waive its right to assert first material breach as a bar to recovery if it accepts the benefits of the contract with knowledge of a breach.  *White*, 395 S.W.3d at 716 (quoting *W.F. Holt Co. v. A & E Elec. Co.*, 665 S.W.2d 722, 733-34 (Tenn. Ct. App. 1983)); *see also Madden*, 315 S.W.3d at 813; *94th Aero Squadron of Memphis, Inc. v. Memphis-Shelby Cnty. Airport Auth.*, 169 S.W.3d 627, 635-36 (Tenn. Ct. App. 2004) ("In general, by accepting benefits under a contract with knowledge of a breach, the non-breaching party waives the breach.")  Because waiver is an affirmative defense, a party asserting waiver of breach has

the burden to show waiver by a preponderance of the evidence. *Madden*, 315 S.W.3d at 813. "A party must by express declaration; or by acts and declarations manifesting an intent and purpose not to claim the supposed advantage; or by course of acts and conduct, or by so neglecting and failing to act, as to induce belief that it was the party's intention and purpose to waive." *Madden*, *id.* at 815 (internal quotation marks and brackets omitted).

In general, a party seeking to terminate a contractual obligation based on the assertion of a first material breach must provide the alleged breaching party notice and an opportunity to cure. *See McClain*, 806 S.W.2d at 197. "In the absence of an express notice provision, the courts will frequently imply an obligation to give notice as a matter of common equity and fairness. *Id.* (citing 3A A. Corbin, *Corbin on Contracts* § 725 (1964)). " Requiring notice is a sound rule designed to allow the defaulting party to repair the defective work, to reduce the damages, to avoid additional defective performances, and to promote the informal settlement of disputes." *McClain*, 806 S.W.2d at 198.

On the other hand, there are some limited circumstances in which acceptance of contractual benefits does not constitute waiver, including (1) where an innocent party attempts to persuade a repudiating promisor to reject that promisor's repudiation and proceed honorably in the performance of the agreement, and (2) where the first-to-breach party fraudulently induces the innocent party to permit the first-to-breach party to continue but thereafter violates the promises made to secure that permission. *Id.*[28]

---

[28]As explained in a treatise on Tennessee law, "when a party decides to cancel a contract because of the other party's breach, this decision is 'fraught with peril'. The risks are three fold: the other party's breach might not be material, the moving party might itself be guilty of the first uncured material breach, or the first party might be deemed to have waived the material breach or be equitably estopped from claiming relief." Tenn. Prac. Series, *Contract Law & Prac.* §

**B.    Application**

Here, even assuming that Mrs. Frazier's failure to disclose the warranty issue in writing constituted a "material" breach, a preponderance of the evidence shows that Beach waived the defense of first material breach.  Beach and Manown became aware of the warranty issue almost immediately after the closing.  Rather than contacting Frazier, Beach and Manown attempted to address the issue themselves by re-designing the screeds to avoid the engine cracking issue and satisfy Honda, which they eventually did.  Beach and Manown continued to operate the company, generating revenue from screed sales, reflecting their acceptance of the benefits of the July 2007 sale of assets by Mrs. Frazier.

Although they were almost immediately aware of the warranty issue, Beach and Manown did not contact Frazier to assert an alleged breach before August 2009, a period of just over *two years*.  Beach simply declined to pay Frazier without explanation, failed to respond to her repeated inquiries for payments from late 2008 forward, and only asserted alleged "breaches" in August 2009 as a *post hoc* defensive measure after repeated demands by Frazier.  Before that time, Beach gave no notice to Frazier, offered no opportunity to cure, and made no attempt to work through the issue or otherwise re-negotiate the APA's payment terms.  He simply abandoned his contractual obligations unilaterally.

Furthermore, language within the APA supports the court's conclusion that Beach waived ACT's breach.  Beach has argued that, because ¶ 10 of the APA states that ACT's representations and warranties would "survive the Closing" of the asset sale, Beach was entitled to raise the issue of ACT's breach at any time.  However, ¶ 12(a) states that "[a]ll . . .

11:15 (updated Aug. 2013).

representations and warranties of the parties" would "remain effective through and shall survive

the Closing Date *for (1) year . . . .*" ¶ 12(a) (emphasis added). "When a contract contains both

general and specific provisions relating to the same thing, the specific provisions control." *Mark*

*VII Transp. Co., Inc. v. Responsive Trucking, Inc.*, 339 S.W.3d 643, 648 (Tenn. Ct. App. 2009)

(citing *Cocke Cnty. Bd. v. Newport Utils. Bd.*, 690 S.W.2d 231, 237 (Tenn. 1985)). Applying

this principle, the court finds that ¶ 12(a) conditions ¶ 10, meaning that the parties agreed that

ACT's representations would survive for one year beyond the closing date.[29] In light of this

provision, it is inexplicable why, if Beach and Manown truly determined (or at least believed)

soon after the closing that ACT had breached its representations and warranties, it would decline

to bring the issue to Mrs. Frazier's attention. Thus, the fact that Beach and Manown chose to

address the warranty issue unilaterally without notice to Mrs. Frazier – even after the one-year

window had elapsed – shows that Beach and Manown waived this alleged breach of the APA by

---

[29]ACT may not have specifically argued about the interaction between ¶¶ 10 and 12
during the bench trial. However, in support of its post-remand Motion for Summary Judgment
on the issue of liability – which the court ultimately denied as moot in favor of the bench trial –
ACT specifically argued that Beach's failure to allege breach within the one-year period
specified in ¶ 12 entitled ACT to judgment. (*See* Docket No. 83, Motion for Summary
Judgment [on] Defendant Liability, at pp. 1-2; Docket No. 84, Statement of Undisputed Material
Facts; Docket No. 85, Memorandum in Support of Motion for Summary Judgment (arguing that
ACT was entitled to judgment because "[d]efendants had one (1) year to assert alleged
deficiencies in representations or warranties, but did not.") (emphasis in original).) During oral
argument at the bench trial and in his post-trial submission, Beach specifically argued that
ACT's "first" alleged breach of ¶ 10 entitled him to judgment (*see, e.g.*, Docket No. 133 at p. 2),
thereby effectively placing the temporal scope of the representations and warranties in ¶ 10 back
at issue. Given that (1) ACT raised this contractual interpretation argument in a previous
submission seeking dispositive relief, (2) Beach placed it back at issue during the bench trial,
and (3) Tennessee law otherwise requires the court to construe the contract's provisions as a
whole and in harmony with each other (where possible), the court finds that it is both necessary
and appropriate for the court to construe ¶¶ 10 and 12 together as a matter of (Tennessee) law.

Frazier/ACT.[30]

Under the circumstances, the court finds that Beach accepted the benefits of the sale of ACT (utilizing the transferred assets to generate revenue) for approximately two years after becoming aware of the warranty issue, thereby waiving his right to assert ACT's breach of the APA on that basis. Beach has not shown that any of the exceptions to the waiver rule apply. Accordingly, the court finds that Beach waived his first material breach defense, that Beach similarly waived his right to pursue ACT/Frazier for alleged breaches by ACT years earlier, and that Beach is therefore liable to Frazier for his repudiation of his payment obligation to Mrs. Frazier under the express terms of the APA.

On a final note, even if the court had found that ACT breached the APA in any other respect that Beach has alleged (*i.e.*, lack of clear title to the molds and failure to apprise Beach and Manown of Mr. Ellis's importance), the court would find that Beach waived the right to assert a first material breach defense for essentially the same reasons stated in this section with respect to the warranty issue.

## IV.     Measure of Damages

Having determined that ACT is entitled to damages for Beach's failure to pay royalties, the remaining question is the appropriate measure of damages. For purposes of simplicity within this section only, the court will refer to ACT as "Frazier."

The parties' dispute concerns the appropriate construction of ¶ 4 of the APA as amended.

---

[30]The court does not explicitly find that Beach and Manown were required to alert Frazier about the issues within one year. Nevertheless, the fact that Beach and Manown identified the issues about which Beach complained in his August 2009 letter either before the closing (losing Mr. Ellis) or shortly after the closing (the warranty issue and molding issue, among others) and yet took no action under the APA, as they were entitled to, is indicative of waiver.

That provision splits the payment obligation into two pieces: (1) $600,000 at or soon after closing, and (2) $500,000 payable in periodic installments as a 2% cut of quarterly screed sales revenues. Incredibly, whoever drafted the contract (apparently Baker Donelson, with input from Gardner and the buyers) did not specify what would happen if the company failed, changed the focus of its business operations away from screeds, or otherwise could not generate $500,000 in a realistic time frame. Mrs. Frazier argues that Beach owes her the full unpaid balance,[31] whereas Beach argues that Frazier is only entitled to the 2% cut both retroactively (a total of $36,908.15) and prospectively, unless and until the remaining balance is paid.[32]

As an initial matter, the court finds that the purchase price in the APA was obligated to be paid in full by Beach and Manown. The APA defines the "Purchase Price" as "$1,100,000," the Amendment to the APA does the same and stated the Purchase Price of $1.1 million is "[t]o be paid," the "Closing Statement" defines the "Purchase Price" as $1,100,000 "*less indebtedness to be paid*" of $500,000 (*see* DX-5 (emphasis added)), and the Non-Competition Agreement states that "*payment of the Purchase Price* constitutes sufficient and adequate consideration" for the agreement. (DX-29 at ¶ 3 (emphasis added)). The plain language of these agreements indicates that the parties intended that the purchase price would ultimately be paid in full, not that the remaining $500,000 balance was simply a contingency or some type of "commission" or

---

[31]As explained in the next section, the $500,000 balance is offset by the amount that Manown has paid and will pay to Frazier under their forbearance agreement.

[32]The parties previously argued these points to Judge Haynes with respect to Beach's Motion for Partial Summary Judgment on the issue of damages. Judge Haynes originally granted that motion. In vacating the court's original judgment in favor of ACT on procedural grounds, the Sixth Circuit expressed no opinion concerning the merits of the court's decision. At any rate, the court's analysis herein is generally in agreement with Judge Haynes' previous analysis, albeit based on a more developed factual record.

"bonus" payment to Mrs. Frazier.  Indeed, the parties' negotiations in forming the APA reinforce the court's conclusion: Mrs. Frazier originally offered ACT for sale for just under $1 million, but Beach and Manown offered to pay her more money in the aggregate ($1.1 million) in return for breaking out the purchase price into a flat amount of $600,000 followed by payment of the balance over time.

Beach has argued that, because there is not an "acceleration clause" in the APA (or in any of the parties' other closing-related agreements), Frazier should be placed in the same position she would have occupied if Beach had not breached in the first place: namely, the amount that she would have received in quarterly payments through the present.  Beach argues that any other result would constitute a "windfall" to Frazier.  By contrast, Frazier has argued that Beach's failure to make any payments to Frazier constituted a repudiation of the agreement, entitling her to the full remaining balance.

"Where one party to a contract announces in advance his intention not to perform it, the other party hereto may treat the contract as broken, and sue at once for the breach, without waiting for the time fixed for performance."  *Church of Christ Home for Aged v. Nashville Trust Co.*, 202 S.W.2d 178 183 (1947).  "When there is a total breach, plaintiff may recover for the value of that part of the performance which was due at the time of trial and also recover the value of that part of the performance which is to come due after trial."  *Jamison v. Jamison Pest Control Co.*, 852 S.W.2d 884, 885-86 (Tenn. Ct. App. 1992).  Accordingly, where a defendant makes a choice to cease performing its obligations under a contract, a plaintiff is not limited to specific performance as a remedy.  *Id.* at 887; *see also Freytag v. Cross*, 913 S.W.2d 171, 174 (Tenn. Ct. App. 1995) (finding that absolute breach entitled non-breaching party to recover "all

damages, past or future," resulting from the breach, and that non-breaching party was "not bound to wait to see if [non-breaching party] would change its decision and perform according to the terms of the contract.")

Under the APA, Beach's obligation to remit payments to Mrs. Frazier based on screed sales was not conditional based on the volume of sales or on Beach's subjective evaluation of the company's general performance relative to his previous expectations. Nevertheless, without informing Mrs. Frazier, Beach simply declined to perform his end of the bargain and did not respond to Mrs. Frazier's initial inquiries as to why Beach had failed to make the first payment or any subsequent quarterly payment. In his August 2009 letter, sent after several quarters of non-payment, Beach acknowledged that he had not paid Mrs. Frazier, apparently because of his dissatisfaction with the company's performance. He stated that he would continue to withhold paying Mrs. Frazier, at least until ACT rolled out a new version of its screeds at an unspecified time. The letter did not promise to pay Mrs. Frazier at any time, did not acknowledge that Beach and Manown actually owed Mrs. Frazier back payments for previous screed sales, and suggested that ACT would pay Mrs. Frazier if "possible" based on the future performance of the company generally. In fact, even after redesigning the screeds, Beach never paid Frazier at any time after sending the August 2009 letter. As Beach's August 2009 letter shows, Beach had effectively repudiated his obligation to pay Frazier the promised quarterly payments (however small) in favor of new subjective conditions that he purported to impose unilaterally without respect to the APA's terms.

Under the circumstances, the court finds that Beach repudiated his remaining performance obligation under the APA and committed a total breach. Frazier was not required

to wait forever to see if and when Beach would change his mind and honor the APA's terms – in fact, Frazier waited over a year and still received no payments before her October 2010 demand letter. Accordingly, Beach's total breach entitles Mrs. Frazier to recover the full balance of Beach's payment obligation, even in the absence of an acceleration clause.[33]

## V.    Calculation of Damages

---

[33]ACT may also be entitled to full damages for another reason. As explained in *Hogan v. Coyne Int'l Enterps. Corp.*, 996 S.W.2d 195, 200 (Tenn. Ct. App. 1998):

> A contract may have several parts. A breach of one part will excuse all of the promised performance by the party where the contract is to be performed as a whole. In such a case, we call the contract "entire," and the complete fulfillment of the contract by either side is required as a condition precedent to the fulfillment of any part of the contract by the other.
>
> If, however, several things are to be done under a contract, and the money consideration to be paid is apportioned to each of the items, the contract is ordinarily regarded as severable. In that case, neither party can claim more than an equivalent for the actual consideration on his part.

*Id.* (internal citations and quotation omitted). In other words, "[a] contract is severable where each part is so independent of each other as to form a separate contract," whereas "[a] a contract is entire when the promises of both parties are interdependent and relate to the same subject matter." *Greene v. THGC, Inc.*, 915 S.W.2d 809, 811 (Tenn. Ct. App. 1995); *James Cable Partners, L.P. v. City at Jamestown*, 818 S.W.2d 338, 344 (Tenn. Ct. App. 1991). "There is no exact definition to determine when a contract is "divisible" or "entire,' therefore, each case ultimately depends on its own facts." *Moulds v. James F. Proctor, D.D.S., P.A.*, 1991 WL 137577, at *10 (Tenn. Ct. App. July 29, 1991) (citing 17A Am. Jr. Contracts § 415 (1991)). Here, the parties' promises under the APA, which essentially amounted to payment of money by Beach and Manown in return for ACT's conveyance of its existing assets, were interdependent and concerned the same subject matter. The remaining $500,000 was an essential part of the $1.1 million purchase price, which the parties in multiple agreements acknowledged constituted the consideration for ACT's agreement to sell its assets to Beach and Manown. Furthermore, payment of the remaining $500,000 required no further performance by Mrs. Frazier. Under the circumstances, it appears that the APA was an entire contract and that the installment payment obligation was not divisible from the rest of the agreement. Because Beach refused to pay ACT at all – and in fact has never paid ACT the quarterly payment – Beach may owe the full balance under the "entire" APA for this independent reason.

As of March 3, 2014, Manown had paid $66,093.04 towards the remaining $500,000 balance, of which Manown has promised to pay a total of $150,000 over time. (*See* Docket No. 131, Attachment No. 1.) Beach does not dispute ACT's contention that ACT has also already garnished $2,493.04 from Beach. This leaves an unpaid balance of $433,906.96, of which Manown has independently agreed to pay an additional $83,906.96, regardless of the disposition of this lawsuit. (*Id.* ¶ 1(e).) Under the circumstances, the court will hold Beach solely liable for the portion of the $500,000 award not already subject to the Forbearance Agreement between ACT and Manown. Accordingly, the court will hold Beach liable to ACT for $347,506.96, reflecting the balance not subject to the Forbearance Agreement less the amount of the garnishment.

The court also finds that, because Beach waived his right to pursue ACT for its alleged breaches, Beach is not entitled to an offset or recoupment against ACT's award.[34]

Because ACT's damages are liquidated, the court will award pre-judgment interest on the award of 10% beginning October 10, 2008, the date on which Beach repudiated his payment obligation to Mrs. Frazier. *See* Tenn. Code Ann. § 47-14-123.

On a final note, the court acknowledges that the result in this case is an unfortunate one for Mr. Beach. ACT has been losing money since Beach closed on the sale of its assets. Although it appears that he likely made some bad business decisions (and may have received bad business advice from Gardner) shortly before and after the closing, the record shows that Beach

---

[34]The original Complaint sought punitive damages. ACT did not seek punitive damages in its Proposed Findings of Fact and Conclusions of Law, nor did ACT argue the issue of punitive damages to the court during the bench trial. Therefore, the court regards ACT as having implicitly abandoned its demand for punitive damages. Even if the court were to consider the issue, the court would find that punitive damages are not warranted.

in good faith attempted to run ACT profitably, even after experiencing serious personal strife. If Beach and/or Manown had raised concerns to Mrs. Frazier within a reasonable time frame following the closing, Beach may have been able to preserve his right to pursue Frazier for any alleged breaches of the APA or otherwise defend against Mrs. Frazier's accusations of breach by him. Instead, he accepted the benefits of the sale (the receipt of all of ACT's assets and any revenues accruing therefrom) without complaint. In essentially choosing to take the bitter with the sweet, Beach foreclosed his ability to withhold his promised performance under the contract without incurring liability to Mrs. Frazier. Furthermore, in choosing to repudiate the agreement by refusing to make any quarterly payments in the manner required by the APA's unambiguous terms, Beach opened himself up to the result here: he now owes Mrs. Frazier the full remaining balance, excepting the aggregate amount that Manown has agreed to pay Mrs. Frazier.

## CONCLUSION

For the reasons stated herein, the court will enter judgment in favor of ACT on its breach of contract claim, the court finds against Beach on his counterclaim for breach of contract, and the court will hold Beach liable to ACT for $347,506.96 plus 10% prejudgment interest accruing from October 10, 2008 forward.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge